******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE G. H. ET AL.*
## (AC 45427)

Alvord, Clark and Palmer, Js.

*Syllabus*

The respondent mother appealed to this court from the judgment of the trial court terminating her parental rights with respect to her minor children G and N. At the time of the trial on the termination petitions, G was two and one-half years old and N was four years old. G, who was born prematurely and is considered medically complex, has never resided with the mother. P, the father of G and N, was also named as a respondent in the petitions for termination but died during the pendency of the proceedings. *Held*:

1. The trial court correctly concluded that the respondent mother failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, within a reasonable time, she could assume a responsible position in the lives of G and N, as the record contained sufficient evidence to support that court's conclusion that the petitioner, the Commissioner of Children and Families, had proven by clear and convincing evidence that the mother failed to rehabilitate, considering the ages and needs of G and N; moreover, contrary to the mother's claims, the trial court acknowledged that the mother complied with medication management and substance abuse treatment, obtained housing and secured part-time employment, but the court also noted that the mother was unclear as to how she would financially support the children if they were returned to her care, and considered the mother's progress in relation to her failure to consistently engage with and reap any benefit from individual counseling services, her resistance to appreciate and articulate how she would avoid negative relationships in the future, and her persistent involvement with P in the face of his multiple arrests for drug sales; furthermore, the court repeatedly emphasized the opinion of a psychologist that the mother exhibited continued and unaddressed mental health difficulties, had only a visiting relationship with G and N, was unable to keep her children safe during her extended relationship with P, and put her relationship with P above the needs of her children, despite acknowledging that it was dangerous for the children to be in a home during drug sales; accordingly, the court's subordinate factual findings, contrary to the mother's claims, were supported by the evidence and the rational inferences to be drawn therefrom and were not clearly erroneous.

2. The respondent mother could not prevail on her claim that the trial court's judgment should be reversed on the basis that its memorandum of decision contained inconsistent statements as to whether it considered only events preceding the filing of the petitions or whether it exercised its discretion to consider events through the time of trial: in the adjudicatory phase, the trial court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation was sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time; in the present case, the two statements that the mother claimed were inconsistent were set forth during the trial court's analysis of whether the mother's degree of rehabilitation was sufficient to foresee that she may resume a useful role in the lives of G and N within a reasonable time, and, therefore, were properly incorporated into the court's determination of whether a ground for termination of parental rights existed; furthermore, regardless of whether the court expressly stated that it considered events preceding the filing of the petitions or through the time of trial, the record demonstrated that the court considered events that occurred after the filing of the petitions and through the time of trial.

3. The respondent mother's claim that the trial court erroneously concluded that termination of her parental rights was in the best interests of G and N was unavailing: the trial court considered and made findings under each of the seven factors delineated in the applicable statute

(§ 17a-112 (k)) and properly determined that, under the totality of the circumstances, the termination of the mother's parental rights was in the best interests of G and N; in the present case, the trial court considered the ages of G and N, as well as the amount of time they have spent in foster care, the children's needs for stability and permanence, the opportunity for the children to have a healthy and emotionally stable life, and its findings as to the mother's failure to rehabilitate; furthermore, although the court acknowledged the relationship between G and N and the mother, as well as the relationship between G and N and their siblings, such a bond did not overcome the court's conclusion that termination of the mother's parental rights was in the best interests of G and N.

Argued October 4—officially released November 22, 2022**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondent mother's parental rights with respect to her minor children, brought to the Superior Court in the judicial district of New London, Juvenile Matters, and tried to the court, *Hoffman, J.*; judgments terminating the respondent mother's parental rights, from which the respondent mother appealed to this court. *Affirmed.*

*Benjamin M. Wattenmaker*, assigned counsel, for the appellant (respondent mother).

*Amanda Szyszkiewicz*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ALVORD, J. The respondent mother, Jessica M. H., appeals from the judgments of the trial court terminating her parental rights with respect to her minor children, G. H. (G) and N. H. (N).[1] On appeal, the respondent claims that the trial court (1) improperly concluded that she had failed to rehabilitate to such a degree as to reasonably encourage a belief that she could assume a responsible position in the lives of her children, (2) made inconsistent statements in its memorandum of decision that require reversal, and (3) improperly concluded that the termination of her parental rights was in the best interests of the children.[2] We affirm the judgments of the trial court.

The following facts, which the court found by clear and convincing evidence, and procedural history, are relevant to this appeal. The respondent has nine children and her history with the Department of Children and Families (department) dates back to 1999. At the time of trial, five of the respondent's children were adults; two were teenagers, N. A. (A) and S. H. (S); and the two at issue in this appeal, N and G, were four years old and two and one-half years old, respectively. The respondent has had twenty-one referrals to the department that include allegations of inadequate supervision, drug use by parents and older children, drug dealing resulting in criminal charges and incarceration, domestic violence, emotional neglect, physical abuse, untreated mental health issues, and medical neglect.

N was born in August, 2017.[3] Shortly thereafter, on September 12, 2017, the petitioner, the Commissioner of Children and Families, filed neglect petitions and motions for orders of temporary custody on behalf of A, S, and N. On October 2, 2017, the orders of temporary custody were sustained and A, S, and N were removed from the respondent's care. On September 4, 2018, the court approved a concurrent permanency plan of termination of parental rights and adoption or reunification with the respondent and Patrick H. with regard to N. On November 9, 2018, A, S, and N were found neglected and were committed to the care and custody of the petitioner. G was born in April, 2019. She was born prematurely, developed chronic lung disease, and is considered medically complex. G was successfully discharged from the care of the pulmonology department at Yale New Haven Children's Hospital on December 14, 2020.

On March 7 and April 22, 2019, the respondent participated in a court-ordered evaluation with Nancy Randall, a psychologist, as a result of the pending neglect allegations as to A, S, and N. At that time, the respondent was diagnosed with generalized anxiety disorder, bipolar 2 disorder, and opiate use disorder. The opiate use disorder was in sustained remission on maintenance therapy.

As part of her evaluation, Dr. Randall indicated that the respondent needed continued support for her recovery and mental health, and "recommended [that the respondent] receive mental health treatment and continued methadone maintenance and psychiatric medication management services."

The respondent participated in Intensive Family Preservation and Reunification and Therapeutic Family Time services with her teenage children, A and S. Upon completion of the court-ordered evaluation in June, 2019, Dr. Randall recommended that the respondent engage in individual counseling and medication management, in order for the petitioner to recommend reunification with the teenage children. On August 6, 2019, the petitioner filed a permanency plan on behalf of the respondent's teenage children, A and S, with a recommendation of reunification.

On July 12, 2019, the petitioner filed a petition for the termination of parental rights as to N. Shortly thereafter, on July 18, 2019, the petitioner filed, with respect to G, a motion for an order of temporary custody, which was granted, and a neglect petition. On October 22, 2019, the court adjudicated G neglected and she was committed to the care and custody of the petitioner.

The respondent was provided with court-ordered specific steps, on November 9, 2018, and October 23, 2019, to facilitate the return of N and G to her care. Additionally, the department referred the respondent to numerous services to aid in her reunification with N and G, including supervised visitation, individual counseling, substance abuse evaluation and treatment, drug screening, mental health services, transportation assistance, case management services, and psychological evaluations.

On August 20, 2020, the petitioner filed a permanency plan on behalf of N and G, with a recommendation of termination of parental rights. That same day, the petitioner filed a permanency plan on behalf of A and S, with a recommendation of reunification. On October 5, 2020, the court approved both permanency plans, and a motion to revoke commitment and an order of six months of protective supervision was granted as to the respondent's teenage children. On March 4, 2021, the petitioner filed a petition for termination of parental rights as to G.

In the petitions, the petitioner alleged that G and N were found in a prior proceeding to have been neglected and that the respondent "failed to achieve the degree of personal rehabilitation that would encourage the belief that, considering the ages and needs of the children, she would assume a responsible position in the life of her children." During the trial, the petitioner introduced testimony from Dr. Randall and department social workers and case managers. The respondent testified

and presented testimony from her case manager in the supportive housing program at The Connection, Inc.; her counselor at the Root Center for Recovery; and Andrea R., her adult daughter.

The respondent gave birth to her first child when she was nineteen years old and had no support from her family. Her history with drugs began when she started taking "percs" because they made her feel good. She was prescribed medication for her mental health issues but did not like the way it made her feel, so "she started using heroin, because it was cheap, but hard to get off." The respondent's work history is minimal and "she has a history of not sustaining employment for any significant period of time."

The respondent married Patrick H., the father of N and G,[4] in 2016. Patrick H. had a significant criminal history dating back to 1988. In August, 2020, Patrick H. was arrested at the family home for possession of illegal narcotics, while A and S were residing there. Patrick H. was found in possession of 100 bags, packaged for sale, of fentanyl, heroin and marijuana. The respondent failed to report this arrest to the department. The respondent "indicated that she and Patrick H. had been selling drugs to support the family some years ago but indicated she was surprised by the arrest in August, 2020." The trial court found that the respondent's "continued denial of any knowledge of [Patrick H.'s] involvement in drug dealing is not credible."

On February 24, 2021, after Patrick H. posted bond on drug charges, the respondent signed a service agreement with the department, confirming that she would not allow Patrick H. back in the home, due to the two teenage children living in the home. The department subsequently received anonymous information that Patrick H. "was frequenting the home on a daily basis." On May 12, 2021, Patrick H. died, of an apparent allergic reaction to seafood, while in a sober house.

The respondent's compliance with individual counseling was inconsistent. From August, 2019, until March, 2020, the respondent was not engaged in individual counseling. From January, 2019, until January, 2020, the respondent saw Stephanie Sloan, an advanced practice registered nurse, for medication management once a month. Sloan diagnosed the respondent with "bipolar disorder, current episode depressed moderate," and recommended that she engage in individual counseling "due to [her] limited understanding as to why [the department] was involved with her family." On December 31, 2019, Sloan indicated that the respondent "was at risk for being discharged due to her missing appointments." Following Sloan's unexpected death in January, 2020, the respondent was referred to Child and Family Services for mental health and medication management. The respondent failed to follow through with the referral, did not engage in the recommended counsel-

ing, and was at risk of running out of her medication. The department "made many efforts to engage [the respondent] in individual counseling and a new medication provider for many months."

In March, 2020, the respondent completed a mental health intake with Sound Community and, in April, 2020, began attending weekly, individual sessions via telehealth. Additionally, she "engaged in medication management and methadone treatment with the Root Center."

In September, 2020, the respondent began seeing a new therapist, Mary Ann Campbell, at Sound Community. The respondent was scheduled to have biweekly virtual meetings with Campbell, who was beginning to develop a treatment plan for the respondent. By October 23, 2020, however, the respondent "had missed three out of her last five appointments for a total of nine missed appointments out of fourteen." As a result of these absences, Campbell was unable to effectuate a treatment plan, and the respondent was sent an engagement letter stating that her case would be closed, unless she scheduled an appointment. The respondent scheduled an appointment for February 14, 2021. The respondent's most recent clinician, Judy Bolanos, was seeing the respondent every two weeks but had recently changed their sessions to every three weeks. "[Bolanos] indicated [that the respondent] is difficult to engage and resistant to discussing things in depth."

The respondent has successfully engaged in substance abuse treatment and medication services, has been compliant with communicating and meeting with the department, and has participated in grief counseling. Additionally, the respondent has participated in all of her supervised visits with N and G When Patrick H. posted bond on February 24, 2021, his visits with N and G were required to be held at the department's offices due to safety concerns related to his drug use and sales. The respondent took the position that her visits with N and G must be combined with Patrick H.'s visits, and thus joined those visits at the department offices. The respondent thereafter "declined visits that were offered in the community with [N] and [G], as she wanted all visits to be with [Patrick H.]."

On September 16, 2021, the court ordered a second evaluation for the respondent, which Dr. Randall conducted. On the basis of her evaluation, "Dr. Randall indicated that the [respondent's] diagnos[es] of bipolar 2 disorder by history and opiate use disorder in sustained remission on maintenance therapy continue to be appropriate." Additionally, Dr. Randall indicated that the respondent "is in limited mental health therapy," is "resistant to greater participation," and needs "to have a better understanding of identifying positive and negative markers in new relationships, in order to avoid further negative relationships." Dr. Randall recom-

mended that the respondent continue participating in grief support services, methadone maintenance, and medication management.

Upon completing her evaluation, Dr. Randall did not recommend reunification because the respondent's "participation in recommended treatment has varied." "Dr. Randall indicated [that the respondent] has done well in recovery but has resisted mental health treatment." The respondent verbalized to Dr. Randall that it was wrong for her and Patrick H. to sell drugs and acknowledged that it posed a danger to her children; however, Dr. Randall indicated that "[the respondent] never was willing to protect her children from [Patrick H.'s] drug sales."

After conducting the parent and child sessions with the respondent, N and G, "Dr. Randall observed that the children do not view [the respondent] as their primary caregiver" and that the respondent "has a visiting relationship with the children." Additionally, "Dr. Randall indicated [that the respondent] minimizes the difficulty likely to occur for [N] and [G] if they are disrupted from their current home, and how that will impact her ability to manage childcare and employment."

At the time of trial, the respondent resided with A and S in supportive housing obtained and subsidized through The Connection, Inc., for which she was paying 30 percent of the rent. She had been employed part-time for six months and had recently secured a second part-time job. During her session with Dr. Randall, the respondent was "unclear [about] how she will financially support the children if they are returned to her care" and "indicated [that] she has no supports other than believing that her older children could help with childcare."

As to the children, the court found that both N and G are thriving in their shared foster care placement and are bonded to their foster care parents. Despite recognizing the respondent and presenting as comfortable in her care, the children do not view her as their primary caregiver. Their current home presents a long-term and adoptive resource for the children. The court also found that since N was removed from the respondent's care, he has resided in eight department placements, three of which were disrupted due to the respondent "creating stress [for the foster] family," engaging in "aggressive behaviors," and posting remarks about one foster mother on Facebook. Additionally, since her birth and release from the hospital, G has never resided with the respondent.

On February 10, 2022, the court, *Hoffman, J.*, issued a memorandum of decision terminating the respondent's parental rights and appointing the petitioner as statutory parent for N and G In the adjudicatory phase,[5] the court found "by clear and convincing evidence that

[the department] made reasonable efforts to locate [the respondent], and to reunify her with [N] and [G], and further that she is unable or unwilling to benefit from the reunification efforts." Of concern to the court was the respondent's "belief [that] she was doing everything possible to reunify with her children but she continued her involvement with [Patrick H.], despite his multiple arrests for drug sales"; her failure "to reap any benefit or insights" from individual counseling services; and her "minimiz[ing] the difficulties she might have if the children are returned to her"; as well as "the issue of stability and permanency for [G] and [N]." Therefore, the court concluded that the respondent "has not made significant progress toward personal rehabilitation and clearly cannot assume a responsible position in [N's] and [G's] [lives] given their age and needs."

In the dispositional phase; see footnote 5 of this opinion; the court considered the seven statutory factors of General Statutes § 17a-112 (k)[6] before finding "that termination of [the respondent's] parental rights is in the best interest of [G] and [N]." This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The respondent first claims that the court improperly concluded that she had failed to rehabilitate to such a degree as to reasonably encourage a belief that she could assume a responsible position in the lives of N and G. Specifically, the respondent argues that "there is insufficient evidence to support the trial court's conclusion that [she] has failed to rehabilitate" and challenges several of the court's subordinate factual findings as clearly erroneous. We disagree.

We begin by setting forth the established principles of law and the applicable standard of review. "The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [she] will be able to assume a responsible position in [her] child's life. Nor does it require [her] to prove that [she] will be able to assume full responsibility for [her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life." (Citations omitted; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 585–86, 122 A.3d 1247 (2015). "Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to [her] former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is

not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the [children] at issue." (Internal quotation marks omitted.) *In re Brian P.*, 195 Conn. App. 558, 568, 226 A.3d 159, cert. denied, 335 Conn. 907, 226 A.3d 151 (2020).

"[The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Citation omitted; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 587. "Whereas, during the adjudicatory phase of a termination proceeding, the court is generally limited to considering events that precede the date of the filing of the petition or the latest amendment to the petition, also known as the adjudicatory date, it may rely on events occurring after the [adjudicatory] date . . . when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Internal quotation marks omitted.) *In re Brian P.*, supra, 195 Conn. App. 569.

"A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Emphasis in original; internal quotation marks omitted.) Id., 569–70.

In determining that the respondent failed to rehabilitate, the court found that the respondent "has attempted to engage in individual counseling but has been inconsistent, [she] has engaged in medication management and [she] has maintained visitation with the children. Despite being referred to individual counseling services by [the department], [the respondent] has failed to reap any benefit or insights from these services. Notably, [the respondent] allowed [Patrick H.] back [into their] home after his arrest for drug sales. She has clearly

failed to gain an understanding of the harmful effects [of Patrick H.'s] drug sales [and that they] placed her children at risk while they resided with her and [Patrick H.]. Also, [the respondent] is unable to articulate how she would avoid negative relationships in the future. [The respondent] has been unable to benefit from mental health treatment services offered to her." Additionally, the court found that "[w]hile [the respondent] clearly loves [N] and [G], her attempts to reunify with them have failed. . . . Of paramount consideration to the court is the issue of stability and permanency for [the children]. . . . [G's] and [N's] need for permanence far outweighs any remote chance that [the respondent] may rehabilitate in the far distant future. [The respondent] has, either because of lack of ability or lack of desire, failed to successfully accomplish what was needed to consider reunification as an appropriate conclusion. [G] and [N] can't afford to wait for [the respondent] to rehabilitate . . . they need permanency and stability now." The court concluded, "[t]hus, the evidence clearly and convincingly establishes that as of the end of trial of this matter, [the respondent] had not sufficiently rehabilitated herself to the extent [that] she could assume a responsible position in [G's] and [N's] [lives] in view of their ages and needs, or within a reasonable period of time thereafter."

The respondent argues, inter alia, that there was insufficient evidence to support the court's determination that she had failed to rehabilitate. To support her argument, she relies on evidence in the record that she (1) successfully engaged in substance abuse treatment and has been drug free since 2016, (2) obtained secure housing "and has been able to do so for many years," (3) was able to maintain consistent legal employment and can "meet the financial needs of her family," and (4) shares a bond with G and N.

Construing the record before us in the manner most favorable to sustaining the judgments of the trial court, as we are obligated to do; see *In re Brian P.*, supra, 195 Conn. App. 569; we conclude that the record contains sufficient evidence to support the court's conclusion that the petitioner had proven by clear and convincing evidence that the respondent failed to rehabilitate, considering the ages and needs of G and N. See General Statutes § 17a-112 (j) (3) (B). At the outset, we note that, contrary to the respondent's contention, the court acknowledged that the respondent (1) complied with medication management and substance abuse treatment; (2) obtained housing; (3) secured two part-time jobs, although the court noted that, in her evaluation with Dr. Randall, "[the respondent] was unclear [about] how she will financially support the children if they are returned to her care"; and (4) loves her children. The trial court considered this progress, however, in relation to the respondent's failure to consistently engage with and reap any benefit from individual counseling ser-

vices, resistance to appreciate and articulate how she would avoid negative relationships in the future, and persistent involvement with Patrick H. in the face of his multiple and continuing arrests for drug sales. We cannot conclude that any of these findings are clearly erroneous. See *In re Shane M.*, supra, 318 Conn. 593 ("[a]lthough the respondent encourages us to focus on the positive aspects of [her] behavior and to ignore the negatives, we will not scrutinize the record to look for reasons supporting a different conclusion than that reached by the trial court"); see also *In re Victoria B.*, 79 Conn. App. 245, 255, 829 A.2d 855 (2003) ("even if a parent has made successful strides in her ability to manage her life and may have achieved a level of stability within her limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, she could assume a responsible position in the life of her child").

Moreover, in its memorandum of decision, the court repeatedly emphasized the opinion of Dr. Randall that the respondent exhibited continued and unaddressed mental health difficulties, had a visiting relationship with G and N, and was unable to keep her children safe during her extended relationship with Patrick H. "The testimony of professionals is given great weight in parental termination proceedings. . . . It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Internal quotation marks omitted.) *In re Jason R.*, 129 Conn. App. 746, 772–73, 23 A.3d 18 (2011), aff'd, 306 Conn. 438, 51 A.3d 334 (2012).

At trial, Dr. Randall opined that the children should not be reunified with the respondent because she had "not seen any indication that [the respondent] is really able and willing to provide [the children] with the safe and nurturing home that they need." Dr. Randall elaborated that the respondent has repeatedly been involved in relationships with "negative components . . . that would be dangerous to the children to be exposed to"; however, the respondent is unwilling to discuss how to identify these potential risk factors to make better choices regarding who she is around and to whom she exposes her children. Additionally, Dr. Randall testified that the respondent continuously put her relationship with Patrick H. above the needs of her children and

that, despite acknowledging that it could be a danger for the children to be in the home during drug sales, she never left the marriage. Accordingly, the evidence supports the court's determination that the respondent had failed to make significant progress toward personal rehabilitation and that she would be unable to assume a responsible role in the lives of G and N within a reasonable time.[7]

The respondent challenges several of the court's factual findings as clearly erroneous. We conclude that the court's subordinate factual findings, each of which we will address in turn, are supported by the evidence and the rational inferences to be drawn therefrom, and, thus, the respondent has failed to demonstrate that there was insufficient evidence to support the court's determination that she failed to rehabilitate.

First, the respondent challenges as clearly erroneous the court's finding that "[the respondent] also indicated that she has no supports other than believing that her older children could help with childcare." In making her argument, the respondent accurately notes that her adult daughter, Andrea R., testified at trial that she would be a resource for the respondent. The respondent proffered no evidence as to other persons who could be a support to her if G and N were returned to her care. Therefore, we conclude that the trial court's finding that the respondent "has no supports other than believing that *her older children* could help with childcare" necessarily includes Andrea R.[8] (Emphasis added.)

Second, the respondent challenges as clearly erroneous the court's finding that "the [respondent] has not received any benefit or insight from mental health services offered to her by [the department]." In support of her argument, the respondent asserts that there was evidence in the record, namely, her own testimony,[9] that she benefitted from the mental health services provided because the parenting programs helped her regain custody of her teenage children and she addressed her poor judgment by "[g]etting clean, stopping from the sale of drugs, engaging in two jobs, engaging in . . . programs and . . . counseling, doing everything that [the department] asked." The court acknowledged the respondent's testimony by stating that, "[o]f concern to the court is [the respondent's] belief [that] she was doing everything possible to reunify with her children but [yet] she continued her involvement with [Patrick H.], despite his multiple arrests for drug sales." Additionally, as set forth previously, the court continuously referred to Dr. Randall's conclusion that "[the respondent] continues to have a lack of understanding as to her struggles, [the department's] involvement, and her lack of keeping her children safe while they resided with [Patrick H.]."

Third, the respondent challenges as clearly erroneous

the trial court's finding that the respondent was "offered numerous services to aid in attaining reunification with [N] and [G], including . . . visitation, individual counseling, substance abuse evaluation and treatment, drug screening, mental health services . . . case management services, [and] psychological evaluations . . . . [However, the respondent] has failed to complete all these services." The respondent then points to the court's own memorandum of decision and asserts that the court "made express factual findings that the [respondent] successfully completed many of these services." The respondent's assertion is correct in that the court found that she "successfully engaged in substance abuse services . . . is compliant with medication services . . . engaged in grief counseling . . . [and] has attended all of her supervised visits with [the] children." The respondent fails to acknowledge, however, that the court also explicitly concluded that her attendance in individual counseling, one of the services the respondent includes as part of her argument, was "inconsistent and her engagement has been minimal." The respondent argues that the trial court "failed to recognize" that the gaps in her counseling were caused by several factors outside of the respondent's control, such as the untimely death of her therapist. We disagree. The court found that, during the gaps, "[the department] made many efforts to engage [the respondent] in individual counseling . . . for many months." Moreover, the trial court found that, once she connected with a new therapist, the respondent missed a total of nine out of fourteen scheduled appointments.

Fourth, the respondent challenges as clearly erroneous the trial court's findings that she (1) "failed to gain an understanding of the harmful effects [of] [Patrick H.'s] drug sales [in that they] placed her children at risk while they resided with her and [Patrick H.]," (2) "continues to have a lack of understanding as to her struggles, [the department's] involvement, and her lack of keeping the children safe while they resided with [Patrick H.]," and (3) "is unable to articulate how she would avoid negative relationships in the future."[10] In challenging these findings, the respondent points to a department social study from November, 2021, which states that the respondent "reported that she understands that she placed her children in harm's way when she engaged in selling drugs"; her testimony at trial in which she testified that she became involved in selling drugs as a way to support her family, but, since the department's involvement in her life, she has realized that selling drugs was "unsafe" for her children; and asserts that "she intends to avoid negative relationships by refraining from dating or having any other romantic partners in the future." The respondent's recognition of how past acts may have harmed her children does not demonstrate her ability to keep the children safe in the future from similar negative activities and influ-

ences in her life, which was the premise of the court's concern. The court's concern stemmed from Dr. Randall's indications that the respondent (1) "never was willing to protect her children from [Patrick H.'s] drug sales" and (2) "needed to have a better understanding of identifying positive and negative markers in new relationships, in order to avoid further negative relationships." Additionally, the respondent's expressed intention to "refrain from dating . . . in the future" does not demonstrate an understanding of how to avoid negative relationships, romantic or otherwise, but rather supports the trial court's finding that the respondent is "resistan[t] to discussing ways to avoid negative relationships."

Fifth, the respondent challenges the trial court's finding that she "minimizes the difficulties she might have if the children are returned to her." The respondent asserts that she has adequate room for the children in her current apartment; she is employed and financially secure enough to cover her monthly expenses; and, based on her successful reunification with A and S, she understands the difficulties she may face if G and N are returned to her care. We are not persuaded. The trial court found that during her evaluation with Dr. Randall, the respondent "was unclear [about] how she will financially support the children if they are returned to her care" and did not consider how the children's return would "impact her . . . ability to manage childcare and employment." Additionally, despite recognizing that the respondent was employed in two part-time jobs at the time of trial, the court found that "she has a history of not sustaining employment for any significant period of time." Moreover, the court found that, "[w]hile [the respondent] clearly loves [the children] . . . motivation to parent is not enough; ability is required." Therefore, the trial court found that the respondent "is unable to meet the developmental, emotional, educational, medical, and moral needs of [N] and [G] . . . [and] does not have stability in her life to enable her to care for [the children]." Furthermore, the trial court properly considered the children's "young age and need for permanency in finding that the respondent's rehabilitation was not foreseeable within a reasonable time." *In re Zion R.*, 116 Conn. App. 723, 739, 977 A.2d 247 (2009).

For the foregoing reasons, we find that there was sufficient evidence for the court to conclude that the respondent had failed to rehabilitate.

II

The respondent next claims that the court's memorandum of decision contains inconsistent statements that require reversal of the judgments terminating her parental rights. We are not persuaded.

We begin by setting forth the standard of review.

"Resolving the respondent's claim requires us to interpret the court's judgment. The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole. . . . If there is ambiguity in a court's memorandum of decision, we look to the articulations [if any] that the court provides. . . . [W]e are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Furthermore, [w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Internal quotation marks omitted.) *In re November H.*, 202 Conn. App. 106, 118, 243 A.3d 839 (2020).

In the adjudicatory part of its decision, the court first determined "by clear and convincing evidence that [the department] made reasonable efforts . . . to reunify [the respondent] with [N] and [G] and, further, that she is unable or unwilling to benefit from the reunification efforts." Thereafter, the court determined that the petitioner sustained her burden to prove that the respondent had failed to rehabilitate under § 17a-112 (j) (B) (3). In setting forth its analysis, the court stated "that when the termination of parental rights petition was filed as to [N], on July 12, 2019, and the [termination of] parental rights petition [was] filed as to [G], on March 4, 2021 . . . [the respondent] had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, considering the ages and needs of her children, she could assume a responsible position in their lives." The court then discussed the respondent's inconsistency in engaging in individual counseling, failure to gain an understanding of the harmful effects of Patrick H.'s sale of illegal narcotics impacting the safety of her children, inability to articulate how she would avoid negative relationships in the future, and lack of stability in her life to enable her to care for the children. In light of this evidence, the court concluded that "as of the end of the trial of this matter, [the respondent] had not sufficiently rehabilitated herself to the extent she could assume a responsible position in [G's] and [N's] [lives] in view of their ages and needs, or within a reasonable period of time thereafter."

The respondent argues that there is inconsistency between the court's initial statement, that *at the time the petitions for termination of parental rights were filed* there was clear and convincing evidence that the respondent had failed to rehabilitate, and the court's concluding statement, that *by the end of trial* there was

clear and convincing evidence that the respondent had failed to rehabilitate. (Emphasis added.) Specifically, she argues that this inconsistency is "highly significant" and that "as a result of the trial court's inconsistent statements in this case, it is impossible to know whether the trial court has only considered events preceding the filing of the petitions, or whether it has exercised its discretion to consider events through the time of trial." We disagree.

"Inconsistent statements can warrant reversal of a trial court's order. *In re Pedro J. C.*, 154 Conn. App. 517, 531, 105 A.3d 943 (2014) ([t]here are instances in which the trial court's orders warrant reversal because they are logically inconsistent rulings), overruled in part on other grounds by *In re Henrry P. B.-P.*, 327 Conn. 312, 335 n.17, 173 A.3d 928 (2017). *In re Ava W.*, 336 Conn. 545, 588, 248 A.3d 675 (2020); see also *In re Jacob W.*, 178 Conn. App. 195, 215–19, 172 A.3d 1274 (2017) (concluding that, even if trial court had applied proper legal test, reversal of judgment was warranted on basis of fundamentally inconsistent findings by court that grandparents' unreasonable conduct interfered with father's parent-child relationship with children and that there was no evidence of unreasonable interference by any person), aff'd, 330 Conn. 744, 200 A.3d 1091 (2019)." (Internal quotation marks omitted.) *In re November H.*, supra, 202 Conn. App. 118–19.

As set forth previously, it is well established that, "[i]n the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights. Practice Book § 35a-7 (a). In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis omitted; internal quotation marks omitted.) *In re Selena O.*, 104 Conn. App. 635, 646, 934 A.2d 860 (2007). The two statements that the respondent takes issue with were set forth during the court's analysis of whether the respondent's degree of rehabilitation was sufficient to foresee that she may resume a useful role in the lives of G and N within a reasonable time and, hence, properly incorporated into the court's determination of whether a ground for termination of parental rights existed. See id.; see also Practice Book § 35a-7 (a).

In her brief, the respondent argues that "it is also impossible for this court to say with certainty what evidence was considered by the trial court in this case" and that, if the court only considered events as of the filing of the petitions for termination of parental rights,

it would not have considered months and years "during which time the [respondent] was able to achieve many of her significant steps toward rehabilitation." Moreover, the respondent argues that, "if this court cannot ascertain whether the trial court exercised its discretion to consider evidence of events through the final day of trial, then it cannot properly evaluate whether there is adequate evidence to support the trial court's legal conclusion that the [respondent] failed to rehabilitate." We disagree.

Regardless of whether the court expressly stated that it considered events preceding the filing of the petitions or through the time of trial, it is evident that the court in fact considered events that occurred after the filing of the petitions and through the time of trial. The petitions for termination of parental rights as to N and G were filed on July 12, 2019, and March 4, 2021, respectively. In its analysis, the court explicitly referred to events that had occurred after the filing of the petitions, namely, the "exhibits and testimony presented at trial," Dr. Randall's psychological evaluation from September, 2021, and the respondent's engagement in grief counseling, which began after Patrick H. died in May, 2021. Moreover, we already have determined that there was sufficient evidence to conclude that the respondent had failed to rehabilitate. See part I of this opinion. Accordingly, we reject the respondent's claim that the court's decision contains inconsistent statements that require reversal.

### III

Last, the respondent claims that the court erroneously found that termination of her parental rights was in the best interests of the children. We disagree.

We first set forth the relevant principles and the standard of review. "In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the [children]. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [children] only if the court's findings are clearly erroneous. . . . The best interests of the [children] include the [children's] interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondent's] parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . .

There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Brian P.*, supra, 195 Conn. App. 579.

The court considered and made findings under each of the seven statutory factors of § 17a-112 (k) before determining that, under the totality of the circumstances, a termination of the respondent's parental rights was in the best interests of N and G. The respondent challenges as clearly erroneous the fact that, "[d]espite the substantial progress made by the [respondent], the trial court found that [she] is in no better position today to provide for [her children] than she was at the time of their removal." The court found that "[N] and [G] have been in foster care most or all of their lives and are in need of permanency and stability." The court also found that the children's "needs are those of all children. They have an interest in sustained growth, development, well-being, and a continuous, stable environment."

In support of her argument, the respondent renews her assertion that several of the court's findings were clearly erroneous.[11] Given the ages of N and G, the amount of time they have spent in foster care—most or all of their lives—and the court's findings as to the respondent's failure to rehabilitate—as detailed in part I of this opinion—we cannot conclude that the court's findings as to the children's need for "stability . . . permanency . . . and the opportunity to have a healthy and emotional[ly] stable life" and the respondent's inability to meet that need are clearly erroneous. See *In re Anthony H.*, 104 Conn. App. 744, 767, 936 A.2d 638 (2007) ("[o]ur appellate courts have recognized that long-term stability is critical to a child's future health and development" (internal quotation marks omitted)), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008); *In re Victoria B.*, supra, 79 Conn. App. 263 (trial court's findings as to best interest of child were not clearly erroneous when much of child's short life had been spent in custody of petitioner and child needed stability and permanency in her life).

Moreover, the respondent asserts that "the trial court failed to consider the detrimental effect of separating these children from [the respondent] and [their] two siblings, [A] and [S] . . . [and] if the [decision] is affirmed, then [G] and [N] will not only lose the bond they have with [the respondent], but they will also lose their bond with their siblings." The respondent cites to the testimony of Matthew Ashmead, a department social worker who observed visits between the respondent, G, and N, that he observed a bond between the respondent and the children. The court did not overlook the relationship between the children and the respondent.[12] The court acknowledged that "[N] recognizes [the respondent] and presents as comfortable in her

care [and] [d]uring visitation he seeks her out for attention and solace" and that "[G] recognizes [the respondent] and presents comfortable in her care." These statements reflect that the court appreciated the relationship between the children and the respondent but, nevertheless, concluded that it was in their best interests to terminate the respondent's parental rights. See *In re Anthony H.*, supra, 104 Conn. App. 765–66 ("[o]ur courts consistently have held that even when there is a finding of a bond between [a] parent and a child, it still may be in the child's best interest to terminate parental rights" (internal quotation marks omitted)). We cannot conclude from our review of the record that this finding is clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** November 22, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Patrick H., the father of G and N, also was named as a respondent in the petitions for termination of parental rights. Patrick H. died on May 12, 2021, during the pendency of these proceedings. We hereinafter refer to the respondent mother as the respondent and to Patrick H. by name.

[2] Pursuant to Practice Book §§ 67-13 and 79a-6 (c), the attorney for the minor children filed a statement adopting in its entirety the brief filed by the petitioner, the Commissioner of Children and Families.

[3] On two occasions, the court's memorandum of decision reflects that N was born in October, 2017. Given that the court accurately set forth N's birthdate previously in its decision, this appears to be a scrivener's error.

[4] Patrick H. was also the father of S, one of the respondent's teenage children, who was born in June, 2006.

[5] "Proceedings to terminate parental rights are governed by [General Statutes] § 17a-112. . . . Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citation omitted; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 582–83 n.12, 122 A.3d 1247 (2015).

[6] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to

make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[7] As part of her argument, the respondent maintains that her "reunification with [A] and [S] has gone well," and argues that the court "does not even attempt to explain its conclusion that [she] is unable to assume a responsible position in the lives of [G] and [N], when she has proven herself to be a capable caregiver for [A] and [S] since October, 2020." The relevant inquiry under § 17a-112 requires the court "to analyze the [parent's] rehabilitative status as it relates to the *needs of the particular child*." (Emphasis added; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 585. In contrast to the maturity of the respondent's teenage children, the children subject to this opinion, N and G, are four years old and two and one-half years old, respectively. Additionally, "[N] has not lived with [the respondent] since [before he was] one month of age and [G] has never lived with [the respondent]" and "the children did not show significant attachments to [the respondent], which was not unexpected given [their] length of time in foster care." Therefore, the respondent's argument is unavailing.

[8] In her brief, the respondent further argues that "the trial court's failure to consider the support that will be provided by her family [Andrea, A, and S] constitutes legal error [because] the failure to rehabilitate ground pursuant to § 17a-112 does not require . . . her to prove that she will be able to assume full responsibility for her child, unaided by available support systems." (Emphasis omitted; internal quotation marks omitted.) We reject the premise of the respondent's argument because, as previously stated, the court acknowledged that the respondent would have the support of her older children.

[9] In support of her argument, the respondent also points to the department's case status reports and studies and a report from a counselor at the Hartford Dispensary. The respondent concedes that some of these documents were not introduced as exhibits at trial. She asserts, however, that the trial court "expressly took judicial notice of the entire record of the prior nondelinquency proceedings, including pleadings, petitions, social studies, status reports, [and] evaluations" and that this court may do so as well. (Internal quotation marks omitted.) She points to the court's statement that it was taking "judicial notice of the entire record of the prior nondelinquency proceedings, including pleadings, petitions, social studies, status reports, evaluations, court memoranda and specific steps, as well as the dates and contents of the court's findings, order, rulings, and judgments." Despite the fact that the court generally stated that it was taking judicial notice of broad categories of documents, that "does not mean that [the court] might use every statement it found in the papers constituting the file with the same effect as though the facts were in evidence before it." (Internal quotation marks omitted.) *In re Mark C.*, 28 Conn. App. 247, 253, 610 A.2d 181, cert. denied, 223 Conn. 992, 614 A.2d 823 (1992).

[10] The respondent further argues that "this is not a case where the [respondent] refused to live separately from [Patrick H.], whose drug [addiction] and unlawful activity posed a threat to the safety of her children. Rather, at the insistence of [the department], the [respondent] agreed to do so." Moreover, she asserts that because Patrick H. died on May 12, 2021, "there is no danger that [she] will ever reside with [Patrick H.] again after she is reunified with her children." We disagree.

"As our Supreme Court has observed, in considering whether a parent has failed to rehabilitate, trial courts have relied on evidence that a parent has continued to associate with a party who poses a danger to a child." *In re Lillyanne D.*, 215 Conn. App. 61, 93, 281 A.3d 521 ("court found that the respondent father enabled the respondent mother and consistently demonstrated a blind spot for appropriately assessing the risk that the respondent mother poses to the children's welfare and safety," which contributed to finding of failure to rehabilitate (internal quotation marks omitted)), cert. denied, 345 Conn. 913,      A.3d      (2022); see also *In re Albert M.*, 124 Conn. App. 561, 565–66, 6 A.3d 815 (trial court's determination that father

failed to rehabilitate was not clearly erroneous because record supported trial court's findings that father had "knowledge of the necessity of changing his relationship with the mother . . . [that] [t]he petitioner presented probative evidence that the relationship between the parents posed a significant barrier to the father's effective parenting . . . and that the father failed fully to appreciate the risk that the mother could pose to their [child]"), cert. denied, 299 Conn. 920, 10 A.3d 1050 (2010).

Here, the court found that "[the respondent] allowed [Patrick H.] back in [the] home after his arrest for drug sales" and did not credit the respondent's "continued denial of any knowledge of [Patrick H.'s] involvement in drug dealing." Additionally, the court found that the respondent "signed a service agreement with [the department] on February 24, 2021, that she would not allow [Patrick H.] back in the home, [but] [the department] subsequently received anonymous information stating that [Patrick H.] was frequenting the home on a daily basis." Moreover, the fact that Patrick H. has died does not resolve the court's concern that the respondent "continued her involvement with [him], despite his multiple arrests for drug sales," especially because the trial court found that the respondent "is unable to articulate how she would avoid negative relationships in the future."

[11] Specifically, the respondent argues that, "[s]ince [N] was removed in September [2017] and [G] was removed in July, 2019, the [respondent] has obtained stable housing, secured legal employment, maintained her sobriety, made progress in engagement with mental health services, and earned enough money to pay her rent and all of her bills." The respondent's argument centers on the same factual findings that she challenged as to the court's determination that she failed to rehabilitate; therefore, we decline to repeat our analysis here. See part I of this opinion.

[12] The court expressly found that "[G] is not bonded with [the respondent]." Additionally, the court did not find that N was bonded with the respondent. Therefore, it likely did not credit Ashmead's testimony, on which the respondent relies. See *In re Cesar G.*, 56 Conn. App. 289, 297, 742 A.2d 428 (2000) ("[t]he court, as the trier of fact, is free to accept or reject, in whole or in part, the testimony offered by either party" (internal quotation marks omitted)).

The bond between the children and their siblings, A and S, is not a consideration in any of the seven statutory factors found in § 17a-112 (k); therefore, the court's failure to consider it was not clearly erroneous. See *In re Brian P.*, supra, 195 Conn. App. 581 n.12 (court's failure to consider bond between child and his grandparents, which is not factor in § 17a-112 (k), was not clearly erroneous).

───────────────────