IN RE SELENA O.*
(AC 28131)

Harper, Lavine and Mihalakos, Js.

<hr>

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued September 20—officially released December 4, 2007

*Michael J. Besso*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellant (petitioner).

*Trudy Condio*, for the appellee (respondent mother).

*Opinion*

LAVINE, J. The petitioner, the commissioner of the department of children and families, appeals from the judgment of the trial court denying the petition to terminate the parental rights of the respondent mother pursuant to General Statutes § 17a-112 (j) (3) (B) (ii) and the permanency plan developed by the department of children and families (department).[1] On appeal, the petitioner claims that the court improperly concluded that the petitioner failed to prove by clear and convincing evidence that the respondent had failed to achieve such degree of personal rehabilitation as would encourage

---

[1] The petitioner also filed a petition to terminate the parental rights of the child's father, which has been withdrawn. In this opinion, we refer to the child's mother as the respondent.

the belief that, within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. We agree with the petitioner and therefore reverse the judgment of the trial court.[2]

The record discloses the following procedural history that is relevant to our review of the claim on appeal. On January 26, 2004, the petitioner invoked a ninety-six hour hold on the child and her two half-brothers.[3] See General Statutes § 17a-101g. On January 30, 2004, pursuant to an order of the court, *Taylor, J.*, the petitioner assumed temporary custody of the child. On that date, the petitioner also filed a petition alleging that the child was neglected and living under conditions that were injurious to her well-being. See General Statutes § 46b-129. On April 29, 2004, Judge Taylor adjudicated the child neglected subsequent to the respondent's plea of nolo contendere. In October, 2004, the department filed a permanency plan with the goal of terminating the respondent's parental rights and adoption of the child. On December 16, 2004, pursuant to General Statutes (Rev. to 2003) § 46b-129 (k) (2), the court, *Graziani, J.*, found that the department needed to make no further efforts to reunite the respondent with the child.

On February 10, 2005, the petitioner filed a petition for the termination of the respondent's parental rights, alleging, among other things, that the respondent had failed to achieve a sufficient degree of rehabilitation as to the issues that led to the removal of the child and had failed to demonstrate that it was likely, given the age and needs of the child, that she would be able to achieve rehabilitation and assume a responsible position in the child's life in the foreseeable future. See General Statutes § 17a-112 (j) (3) (B) (ii). On July 19,

---

[2] Counsel for the child filed a statement adopting the brief of the petitioner.

[3] The respondent's sons are not the subject of this appeal.

2005, the petitioner filed an ex parte motion for emergency relief to suspend the respondent's visitation with the child because she was under the influence of a substance that rendered her barely able to stand when she visited with the child on July 15, 2005. Judge Graziani granted the motion.

The trial on the petition commenced on December 13, 2005, and was continued on December 14, 2005, and January 17, March 21 and May 30, 2006. On June 28, 2006, the petitioner filed a motion to open the evidence,[4] to which the respondent objected on July 7, 2006. The petitioner withdrew her motion to open the evidence on July 19, 2006.[5] The court, *Crawford, J.*, rendered judgment denying the petition for termination of the respondent's parental rights on September 27, 2006. The petitioner timely filed an appeal.

In her oral decision, Judge Crawford found the following facts. The respondent was born on October 14, 1969, and married the father of her two sons on December 31, 1989. She was incarcerated for five months in 1994 for an incident of domestic violence. The respondent and her husband separated in 1998 and were divorced two years later. The court further found that the department was first involved with the respondent and her two sons in 1995 due to the respondent's substance abuse, emotional neglect and physical neglect of her sons and domestic violence. Her sons were removed from her home in 1997 and placed with their paternal grandmother. The sons were returned to the respondent's custody in 1999.

---

[4] In her motion to open the evidence, the petitioner represented, in part, that Coventry House, the program in which the respondent was participating, reported that the respondent was no longer a resident as of mid-June, 2006.

[5] In the petitioner's notice of withdrawal of the motion to open the evidence, she represented, and the respondent agreed, that at the time the motion to open the evidence was filed, the respondent was no longer residing at Coventry House and her whereabouts were unknown.

The respondent became involved with the father of the child who is the subject of this appeal in 1996. They were together for approximately six years until the department removed all three of the respondent's children from her care. The child at issue was born on February 24, 2000. Eleven days later, the respondent suffered a heart attack and a stroke. Due to partial paralysis of her left side, the respondent received extensive therapy from Easter Seals for eight months to one year.

The department became involved with the family again in December, 2003, when the child's Head Start teacher contacted the department and alleged that the child was emotionally neglected. The child was unhappy, aggressive and poorly behaved in school. The teacher also reported that on December 18, 2003, when the respondent brought the child to school, the respondent had a swollen black eye. The respondent stated that the child had caused the black eye by head butting her. After the respondent left, the child reported that her father had hit the respondent, causing the black eye. The respondent subsequently admitted that the father had hit her.

On December 18, 2003, the respondent and the child's father entered into a service agreement that required the child's father to leave the home. The respondent and the child's father entered into another service agreement on December 23, 2003.

Lindy Melendez, a department social worker assigned to the case, submitted an affidavit in support of the petitioner's motion for an order of temporary custody in which she attested to the following.[6] On January 22,

---

[6] In her affidavit, Melendez described the child as defiant and clingy, one who yelled and acted out when she did not want to do what she was told. Immediately after the child was removed from the respondent's home, she was placed in a safe house until February 20, 2004. Thereafter, she was placed with her paternal grandparents. The grandmother asked the department to remove the child because she and the paternal grandparent were old and

2004, the child's maternal grandmother reported to the department that the respondent had been drinking, smoking marijuana and possibly using cocaine. The grandmother had not witnessed those activities first-hand but learned of them from her grandchildren. Melendez made an unannounced visit to the respondent's home that day and observed a gauze bandage on the respondent's left wrist, scratches above the bandage and a large blue and green bruise on the back of the respondent's neck that extended over her left shoulder. The respondent asserted that her injuries were the result of her tripping over a toy and falling on a coffee table.

On January 26, 2004, the respondent contacted Melendez at approximately 9:30 a.m. to report that the child's father had spent the night because he was ill and had nowhere to go. The respondent asked Melendez to meet with the father. Melendez informed the respondent that the father was in violation of the service agreement.

---

not in the best of health. She also wanted the child removed because the child was out of control, having bitten, punched and kicked her grandparents.

The petitioner removed the child from her paternal grandparents' home on May 19, 2004, and placed her in a foster home where she remained until March, 2005. The child was disruptive of the placement as she often had temper tantrums and screaming spells. She stole things from members of the household and hid them in or around her bed and backpack. At the request of the foster parent, the petitioner removed the child from the foster home on March 3, 2005, and placed her in another foster home. The first foster parent believed that the child could benefit from being in a home where she was the only child.

Most of the child's bad behavior in the foster home or her grandparents' home occurred at bedtime. At school, she had temper tantrums that usually occurred around nap time. She refused to take naps, stood on tables and used toys inappropriately. On one occasion, after the child had visited with her father, she took the chain links in her classroom and wrapped them around her ankles, stood on a table and said, "Look at me, I'm daddy."

On March 18, 2005, the child was diagnosed with attention deficit hyperactivity disorder and prescribed Ritalin. In late November, 2005, the child was removed from the second foster home, again due to behavioral problems. She was placed in a third foster home where she resided at the time of trial.

The respondent said that she would try to find the father a place to stay, and Melendez informed her that it was not her responsibility to do so. That afternoon, the petitioner invoked a ninety-six hour hold on the children. See General Statutes § 17a-101g. Melendez identified the issues affecting the respondent as substance abuse, emotional and physical neglect of the child and domestic violence. The court found that the respondent was the victim of domestic violence first at the hand of her former husband and later at the hand of the child's father.

The court also found that the respondent reported being drug and alcohol free for seven years preceding the petitioner's removing her children from her home. The respondent relapsed when the petitioner took the children into custody because the child's father was present, in violation of the service agreement. After the children were removed, the department referred the respondent for domestic violence counseling, individual counseling, substance abuse evaluation and any recommended treatment. The respondent twice referred herself for substance abuse treatment but failed to complete any program successfully. The respondent completed an anger management program and, according to Melendez, tried to achieve rehabilitation.

During 2004 and 2005, the respondent continued to test positive for cocaine and marijuana. She was arrested in October, 2005, for her involvement in an incident of domestic violence. She lost her apartment and was transient between November, 2005, and February, 2006. The respondent's probation officer applied for an arrest warrant for a violation of probation, but the respondent arranged to turn herself in.

The court concluded that "something gave [the respondent] a wake-up call" while the trial was in progress in January, 2006. The court did not know whether

the "wake-up call" was due to the prospect of losing the child permanently or becoming a mother again.[7] In January, 2006, the respondent voluntarily entered a twenty-eight day detoxification program and then a residential program at Coventry House. The respondent's drug tests during the time she was in Coventry House were negative for alcohol, cocaine, heroin, Oxy-Contin and amphetamines. The program at Coventry House addressed coping skills, patterns of abuse, identification of triggers and the ability to heal past trauma. The respondent was in compliance with the program at the time of trial. The court also found that, subsequent to trial, the respondent transitioned into another placement in connection with Coventry House.

In summarizing the respondent's relevant behavioral history, the court stated that the respondent had a substance abuse problem prior to 1999 but had been "clean" for seven years. The court speculated that "[t]he removal of the children may have been a trigger for her relapse." The respondent had been given opportunities to address her challenges with respect to substance abuse and domestic violence, but she failed to comply until January, 2006. The court stated the relevant question as whether the respondent "can . . . be rehabilitated in a reasonable time so as to resume her parenting role . . . ."

In reaching its conclusion, the court found that the department had removed the respondent's children from her care because she violated a service agreement. The respondent had been a victim of extreme domestic violence at the hand of her daughter's father, who was no longer a part of the respondent's life. The program at Coventry House in part addressed issues of domestic violence. On September 27, 2006, the court concluded

---

[7] The respondent had reported to her probation officer that she was pregnant.

in light of the respondent's parenting abilities prior to the removal of her children, her participation in a treatment program and sobriety since January, 2006, and her expected completion of the Coventry House program in three months, followed by a year of monitoring, that "within a reasonable period of time, [the respondent] can resume her role as a parent to [the child]."

On appeal, the petitioner claims that the court based its conclusion that the respondent could achieve rehabilitation in a reasonable time "principally, centrally and decisively" on facts that were not in evidence, namely, that the respondent continued successful participation in the program at Coventry House and would complete the program in three months.[8] We agree with

[8] The petitioner pointed out that the respondent conceded in her brief that the court based its conclusion that she could rehabilitate herself within a reasonable period of time on facts that were not in evidence regarding her participation and progress in the Coventry House program. The respondent also made that concession at oral argument before us. The respondent nonetheless claims that there are other factors that support the court's conclusion. For example, the respondent contends that the court based its decision in part on the petitioner's decision to withdraw the termination of parental rights petition against the child's father and on the child's psychological needs.

We agree that the respondent conceded that the court based its conclusion on a fact that was not in evidence. As to the respondent's arguments concerning the withdrawal of the petition to terminate the parental rights of the child's father and the child's psychological needs, neither of those issues is relevant to whether the respondent achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. There is no nexus between the petitioner's withdrawing the petition to terminate the parental rights of the child's father and the respondent's ability to achieve sufficient rehabilitation. The child's psychological needs concern the dispositional phase of a termination of parental rights proceeding, not the adjudicatory phase. See, e.g., *In re Shaun B.*, 97 Conn. App. 203, 206–207, 903 A.2d 246 (2006) (hearing on petition to terminate parental rights consists of two phases: in adjudicatory phase, court determines whether one of statutory grounds for termination exists by clear and convincing evidence; if court determines statutory ground exists, it proceeds to dispositional phase).

the petitioner that the factual predicate for the court's conclusion was not in evidence.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Brittany J.*, 100 Conn. App. 329, 334, 917 A.2d 1024 (2007).

"A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority, when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence. . . . The question for the court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Ebony H.*, 68 Conn. App. 342, 348–49 n.4, 789 A.2d 1158 (2002). If the court's conclusions or findings of

fact rest on speculation rather than on sufficient evidence, they are clearly erroneous. See *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 419, 880 A.2d 882 (2005); *State* v. *Smith*, 40 Conn. App. 789, 801, 673 A.2d 1149, cert. denied, 237 Conn. 915, 675 A.2d 886, cert. denied, 519 U.S. 873, 117 S. Ct. 191, 136 L. Ed. 2d 128 (1996); *Williams* v. *Campanaro Construction Co.*, 20 Conn. App. 709, 711–13, 570 A.2d 228 (1990).

"Where . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's fact finding process, a new hearing is required." (Internal quotation marks omitted.) *New Haven* v. *Tuchmann*, 93 Conn. App. 787, 795, 890 A.2d 664, cert. denied, 278 Conn. 903, 896 A.2d 104 (2006).

General Statutes § 17a-112 (j) provides in relevant part that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . (B) the child . . . (ii) is found to be neglected or uncared for . . . and [the parent] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"Personal rehabilitation . . . refers to the restoration of a parent to his or her former constructive and useful role as a parent [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a

responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999).

"In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights." Practice Book § 35a-7 (a). "In the adjudicatory phase, the court *may* rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original; internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 495, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003).

We have reviewed the record, including the evidence at trial, and the briefs and arguments of the parties. The parties agree on the following facts, which find support in the record. The petitioner filed a petition for termination of the respondent's parental rights in February, 2005. The trial was held on December 13 and 14, 2005, and January 17, March 21 and May 30, 2006. On the last day of trial, the court heard evidence from David M. Mantell, a clinical psychologist, concerning the best interest of the child, and final arguments of the parties. The parties also agree that in reaching its

conclusion, the court relied on the "fact" that the respondent completed nine months of the program at Coventry House and would complete the program in three months.

In her brief, the petitioner set forth the dates of certain events supported by references to the appropriate portions of the transcript. See Practice Book § 67-4 (c). The respondent entered a detoxification program at Alcohol and Drug Recovery Centers in January, 2006. The respondent entered Coventry House on February 2, 2006. Gloria Cooper, a counselor trainee with Coventry House, described the program's duration as being nine to twelve months. All of the evidence concerning the respondent's participation in the program at Coventry House was presented at trial on March 21, 2006. Critically, the record of evidence presented at trial demonstrates that the court heard no evidence of the respondent's participation in the Coventry House program beyond March, 2006.

In its oral decision, the court found on September 27, 2006, that the respondent had completed nine months of the Coventry House program, from January to September, 2006. On the basis of our review of the evidence, we conclude that there is no evidence to support a finding that the respondent entered the program in January, 2006. She therefore could not have completed nine months of the program in September, 2006. Furthermore, without evidence that the respondent continued to comply with the Coventry House program beyond March, 2006, the court's conclusion that the respondent was still participating in the program in September, 2006, and would complete the program in three months was based on pure speculation. This clearly erroneous finding was central to the court's conclusion that the respondent could achieve rehabilitation.

The petitioner argues that not only did the court rely on facts that were not in evidence, but it also relied on a nonexistent fact. In support of this argument, the petitioner asks this court to take judicial notice of *In re Dante N.*, Superior Court, judicial district of Tolland, Juvenile Matters at Rockville, Docket No. T11-CP06-012605-A. "Judicial notice may . . . be taken at any stage of the proceedings including on appeal." (Internal quotation marks omitted.) *Drabik* v. *East Lyme*, 234 Conn. 390, 398, 662 A.2d 118 (1995). We take judicial notice as requested by the petitioner. See *Karp* v. *Urban Redevelopment Commission*, 162 Conn. 525, 527, 294 A.2d 623 (1972) ("[t]here is no question . . . concerning our power to take judicial notice of files of the Superior Court, whether the file is from the case at bar or otherwise"). *In re Dante N.* reveals that the respondent gave birth to a child (newborn) on August 8, 2006. We take judicial notice that on September 7, 2006, Judge Graziani granted the petitioner's motion for an order of temporary custody of the newborn, who was in immediate physical danger from his surroundings.[9] The respondent subsequently agreed, in *In re Dante N.*, to confirm the order of temporary custody.

We conclude therefore that the court's finding that the respondent could achieve rehabilitation within a reasonable period of time to resume her role as a parent

[9] In support of the motion for temporary custody, a department social worker, Adam Liebowitz, submitted an affidavit under oath, attesting that the respondent was discharged unsuccessfully from Coventry House after four months in June, 2006, for lack of compliance. She took up residency at the Tri Town Shelter (shelter) and gave birth at the University of Connecticut Medical Center. The child's meconium screening tested positive for cocaine, and the department was contacted. The respondent was uncertain of the newborn's father. She denied using drugs but submitted to a hair toxicology screening, which was positive for cocaine. The shelter has a strict policy of no drug use. On the basis of the positive drug screening, the shelter discharged the respondent and the newborn. The respondent had no place to live. The petitioner took custody of the newborn pursuant to a ninety-six hour administrative hold. See General Statutes § 17a-101g.

to the child is speculation founded on clearly erroneous subordinate factual determinations that the respondent had been in a treatment program at Coventry House and sober since January, 2006, and that she was near completion of the program at the time of judgment. We further conclude that the court's finding on this important issue was central to its decision and "undermine[s] appellate confidence in the court's fact finding process . . . ." (Internal quotation marks omitted.) *New Haven* v. *Tuchmann*, supra, 93 Conn. App. 795. Neither this court nor the trial court may speculate, or make a finding with respect to a termination of parental rights petition, on the basis of evidence that is not in the record. See *In re Shane P.*, 58 Conn. App. 234, 243, 753 A.2d 409 (2000) (respondent cannot argue possibility of release on probation and bootstrap that possibility into matter of such importance that without its consideration court commits reversible error).[10]

The judgment is reversed and the case is remanded for further proceedings in accordance with law.

In this opinion the other judges concurred.

[10] Because we reverse the judgment with respect to the court's finding in the adjudicatory phase of the proceeding, we need not address the petitioner's second claim concerning the department's permanency plan.