******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# HOUSING AUTHORITY OF THE TOWN OF EAST HARTFORD *v.* HARRIETT WILLIAMS
## (AC 48089)

Elgo, Seeley and Bishop, Js.

*Syllabus*

The plaintiff landlord appealed from the trial court's judgment for the defendant tenant in the plaintiff's summary process action. The plaintiff claimed, inter alia, that the court improperly found that certain evidentiary statements proffered by the plaintiff were the product of duress. *Held*:

The trial court's finding that certain written statements by former tenants of the plaintiff were likely made under duress was clearly erroneous, as there was no basis in the record for such a finding other than mere speculation.

The trial court erroneously required the plaintiff to submit direct evidence to establish its serious nuisance claim, as such a requirement is contrary to law, and, on the basis of this court's careful review of the ample testimonial, documentary, and security video evidence admitted at trial, this court was left with a definite and firm conviction that a mistake had been committed with respect to the trial court's finding that there was no evidence in the record that the defendant committed a serious nuisance through violent altercations in the defendant's unit and alleged drug activity in the defendant's unit.

This court determined that the plaintiff was entitled to a new trial, as the trial court's factual findings were clearly erroneous, premised in part on speculation, contradictory, and incorrect as a matter of law and, thus, were not harmless and warranted reversal of the judgment rendered against the plaintiff.

Argued September 9, 2025—officially released March 31, 2026

*Procedural History*

Summary process action, brought to the Superior Court in the judicial district of Hartford, Housing Session, and tried to the court, *Esperance-Smith, J.*; judgment of possession for the defendant, from which the plaintiff appealed to this court. *Reversed*; *new trial*.

*Michael S. Wrona*, for the appellant (plaintiff).

*Opinion*

ELGO, J. In this summary process action, the plaintiff, the Housing Authority of the town of East Hartford, appeals from the judgment rendered by the trial court in

favor of the defendant, Harriett Williams.[1] On appeal, the plaintiff claims that the court **(1)** improperly found that certain evidentiary statements proffered by the plaintiff were the product of duress and **(2)** erred in requiring direct evidence to find that the defendant had committed a serious nuisance. We agree and, accordingly, reverse the judgment of the trial court.

The record reveals the following facts and procedural history. The plaintiff is the owner of Meadow Hill, a low-income housing development in East Hartford (development). On or about December 20, 2021, the defendant entered into a lease agreement with the plaintiff for a unit in the development (unit). At all relevant times, the defendant remained in possession of the unit.

On January 1, 2023, a tenant of the plaintiff, identified as Lucius Mathis, and another unidentified individual exited the defendant's unit and immediately began attacking each other with knives. That violent altercation spilled into the elevator, where they repeatedly stabbed each other, causing injuries. The unidentified individual sustained a punctured lung, and Mathis sustained various lacerations.[2]

On December 7, 2023, a tenant of the plaintiff, identified as Julia Rivera, dragged another tenant, identified as Angela Brown, out of the defendant's unit by her hair and into the hallway. Brown remained in the hallway, knocking on the defendant's door for about ten minutes.

At approximately 3:25 a.m. on December 29, 2023, the plaintiff's security cameras recorded Mathis exiting the defendant's unit, walking through the building, and

---

[1] The defendant appeared but has not participated in this appeal. Because she did not file an appellate brief, we ordered that the appeal shall be considered on the basis of the plaintiff's brief and appendix, the record, as defined by Practice Book § 60-4, and oral argument by the plaintiff. See, e.g., *Ammar I.* v. *Evelyn W.*, 227 Conn. App. 827, 830 n.2, 323 A.3d 1111 (2024).

[2] Following that January 1, 2023 altercation, Mathis was evicted from his residence in the development. He thereafter continued to live as an unauthorized occupant in the development with Julia Rivera, another tenant of the plaintiff.

entering Rivera's unit, where he lived as an unauthorized resident. Rivera entered her unit at approximately 5:27 a.m. At this point, Mathis apparently was unresponsive. Rivera, or another resident, called emergency services, who arrived at Rivera's unit at approximately 5:37 a.m. and attempted to revive Mathis. Their efforts were unsuccessful, and Mathis died due to a drug related overdose.[3]

In addition to these three incidents, the plaintiff's security cameras recorded heavy foot traffic at the defendant's unit on a recurring basis. The foot traffic was comprised of various individuals, some of whom were tenants, visiting the unit for varying lengths of time and at all hours of the day and night.

On December 12, 2023, the plaintiff sent the defendant a pretermination notice. On January 31, 2024, the plaintiff served the defendant with a notice to quit. On March 12, 2024, the plaintiff served the defendant with a summary process complaint, attaching both the pretermination notice and the notice to quit. In count one of its complaint, the plaintiff alleged that the defendant had violated her lease[4] by disturbing her neighbors' quiet enjoyment, engaging in or allowing others to engage

---

[3] Rivera subsequently was evicted from the development due to this incident and for allowing Mathis, an unauthorized individual, to live with her.

[4] The defendant's lease provides in relevant part that the tenant "[s]hall act, and cause household members or guests to act, in a manner that will not disturb other resident's peaceful enjoyment of their accommodations and will be conducive to maintaining the development in a decent, safe and sanitary condition." The defendant's lease also provides in relevant part that the tenant "[s]hall not engage in any unlawful activities in the dwelling unit or premises, and shall prevent criminal activity in the unit or premises . . . . Any of the following criminal activities by a [h]ousehold member, on the premises . . . shall be a violation of the lease, a cause for termination of tenancy, and for eviction from the unit: (a) any crime or threat of physical violence to persons or property . . . (b) illegal use, sale, manufacture or distribution of narcotics, or possession with the intent to use, sell, manufacture or distribute controlled substances." Furthermore, the lease provides that the plaintiff may terminate the lease for a "serious or repeated" lease violation, including if the tenant or the tenant's guests cause "physical violence to other tenants . . .

in physical violence regarding the December 7, 2023 altercation between Rivera and Brown, and using or allowing others to use her unit to sell drugs. In count two, the plaintiff alleged that the defendant had committed a nuisance, as defined by General Statutes § 47a-32,[5] in light of both the December 7, 2023 altercation and the defendant's use of her unit to sell drugs. In count three, the plaintiff alleged that the defendant committed a serious nuisance, as defined by General Statutes § 47a-15,[6] for the same reasons specified in count two. In count four, the plaintiff alleged that the defendant violated her responsibilities as a tenant, as defined in General Statutes § 47a-11,[7] by creating a nuisance, by using her unit to sell drugs, and in light of the December 7, 2023 altercation.

On April 19, 2024, the defendant filed an answer and special defenses, denying the plaintiff's allegations and alleging that any statements made about her were made under duress.[8] The matter was tried to the court on July 3 and August 9, 2024.

At trial, the plaintiff called witnesses Urleen Naughton,[9] the compliance director for the plaintiff; Brian Dixon, the housing coordinator for the

---

or threaten the health, safety or right to peaceful enjoyment of our premises by other residents or employees . . . ."

[5] General Statutes § 47a-32 defines a nuisance as including, but not limited to, "any conduct which interferes substantially with the comfort or safety of other tenants or occupants of the same or adjacent buildings or structures."

[6] General Statutes § 47a-15 defines a serious nuisance in relevant part as "conduct which presents an immediate and serious danger to the safety of other tenants or the landlord" or "using the premises or allowing the premises to be used for . . . the illegal sale of drugs . . . ."

[7] General Statutes § 47a-11 defines a tenant's statutory responsibilities, which include keeping the premises "clean and safe" and conducting himself or herself and guests "in a manner that will not disturb his neighbors' peaceful enjoyment of the premises or constitute a nuisance . . . or a serious nuisance . . . ."

[8] Specifically, the defendant pleaded that "[e]verything that was said about [her] was by a third part[y] and signed by several people in order to keep their apartment[s]."

[9] The transcripts refer to Naughton as both Urleen and Lynn.

development; and Frank Healy, the information technology manager for the plaintiff. The plaintiff also introduced several exhibits into evidence, including security footage videos, demonstrative exhibits, and written statements by Rivera, Dixon, and former resident Frances Brewster.[10]

Naughton testified that the plaintiff sought to evict the defendant due to "excessive amounts" of disturbances, illegal activity, and tenants being harmed as a result of visits to the defendant's unit. Naughton testified that she had received "numerous complaints in [regard] to the drug activity in the building . . . [s]temming from [the defendant's] unit." Naughton further testified that the defendant's activities constituted a "health and safety violation" and "other tenants [were] concerned about their safety." Naughton testified that Brown, Rivera, and Brewster had complained about the defendant. Additionally, Naughton testified that other residents, who did not provide statements, had likewise complained to the plaintiff about the defendant.

Healy testified that he had reviewed approximately twenty days of security camera footage involving the door to the defendant's unit. From that footage, Healy created demonstrative exhibits of the foot traffic at the defendant's unit. Those exhibits were admitted into evidence as full exhibits at trial.[11] Those exhibits documented fifty visits to the defendant's unit on December 14, 2023; forty visits on January 8, 2024; forty-four visits on February 2 and 3, 2024; twenty-seven visits on March 3 and 4, 2024; thirty-one visits on April 1 and 2, 2024; and twenty-seven visits on June 28 and 29, 2024.

---

[10] Those exhibits included an uncut video from approximately 8:03 p.m. on December 6, 2023, to 12:37 a.m. on December 7, 2023, which showed the foot traffic to and from the defendant's unit and was representative of the type of security footage Healy reviewed to create the plaintiff's demonstrative exhibits recording the heavy foot traffic at the defendant's unit.

[11] The plaintiff's demonstrative exhibits (1) described the visitors to the defendant's unit on a particular day, (2) noted the number of times that visitors entered the defendant's unit that day, and (3) noted the length of time the visitors stayed in the defendant's unit.

Not all visits, however, were unique, with some individuals visiting multiple times per day.

Also admitted into evidence were several written statements by former tenants, which described drug activities in the defendant's unit. Rivera's written statement provides: "I live at [the development] and there has been [drug selling] in the [defendant's unit]. [The defendant] sells the crack [from] her unit in her bedroom. There is a lot of drug [selling]." Brewster's written statement provides in relevant part: "I'm receiving drugs in exchange for money from . . . [the defendant] in [her unit]."

Dixon's written statement, which concerned a recorded statement from Brown, provides in relevant part: "Brown stated that she had spent the money and no longer had it. . . . [Naughton] asked what happened to the other forty dollars. It was then that Brown admitted to 'buying' from [the defendant] out of [her unit]. Brown seemed scared that she told us this information and as a result did not accompany us up to [the defendant's unit] . . . ." Dixon testified that "buying" meant purchasing narcotics. Dixon further testified that Brown offered her statement to the plaintiff "voluntarily" and that the plaintiff made no promises to Brown in exchange for her statement.

Mathis' statement, which was admitted into evidence without objection through Naughton's testimony, provides in relevant part that the January 1, 2023 altercation was the result of a "drug deal that went bad" and that the unidentified individual "owed [Mathis] money for the drugs that [he and the defendant] were selling out of [the defendant's] unit." Naughton further testified that Mathis reported that crack, cocaine, and fentanyl were being sold out of the defendant's unit.[12]

The defendant testified on her own behalf at trial.[13] She produced no other witnesses or additional evidence.

---

[12] Naughton's testimony regarding Mathis' statement was admitted at trial into evidence without objection by the defendant.

[13] We note that the court made no credibility determination as to the defendant's testimony, concluding, instead, that the plaintiff had not met its burden of proof with respect to any of the counts.

She testified that the plaintiff had evicted residents who visited her apartment "because they wanted statements from these people to testify or to say something against me . . . ." Much of the defendant's testimony accused the plaintiff of proffering "false statements" against her. The defendant also denied the amount of foot traffic at her apartment, stating that she did not receive the number of visitors the plaintiff alleges the recordings and demonstrative exhibits show. The defendant, however, subsequently explained that the visitors came to her unit to help her with cooking and to play cards.

The defendant testified that she did not "sell any drugs. I never sold drugs. I had sold drugs twenty years ago, but . . . in the recent past, I have not sold [any] drugs . . . ." The defendant claimed that the statements provided by previous residents were false and the product of the plaintiff's coercion. The defendant also claimed that, regarding the December 7, 2023 altercation, she had asked Rivera to remove Brown from her unit before Rivera "dragged [Brown] out . . . of [the defendant's] unit."

In its memorandum of decision, the court found that the written statements by former tenants were "likely made in duress" and discredited them. The court determined that there was "no evidence" of the defendant's involvement in any instances of violence that took place. The court also determined that there was "no evidence presented that the defendant was engaged in or allowed the illegal sale of drugs on the subject premises" and that there was "no direct evidence" that Mathis' death was related to drug activity at the defendant's unit. The court specifically cited the lack of "direct evidence" in the record regarding any alleged drug activity. The court determined that the plaintiff failed to meet its evidentiary burden for serious nuisance and that "[t]here was insufficient evidence to establish that the defendant violated her lease or created a nuisance . . . ." This appeal followed.

As a preliminary matter, we note that "[s]ummary process is a special statutory procedure designed to provide

an expeditious remedy. . . . It enable[s] landlords to obtain possession of leased premises without suffering the delay, loss and expense to which, under the common-law actions, they might be subjected by tenants wrongfully holding over their terms. . . . Summary process statutes secure a prompt hearing and final determination. . . . Therefore, the statutes relating to summary process must be narrowly construed and strictly followed." (Internal quotation marks omitted.) *Housing Authority* v. *Stevens*, 209 Conn. App. 569, 575, 267 A.3d 927, cert. denied, 343 Conn. 907, 273 A.3d 234 (2022).

Further, it is well established that "[t]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous." (Internal quotation marks omitted.) *Altama, LLC* v. *Napoli Motors, Inc.*, 181 Conn. App. 151, 158, 186 A.3d 78 (2018). "The trier of fact's determination of a question of fact will not be overturned unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Under the clearly erroneous standard of review, a finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *Giglio* v. *Ardohain*, 233 Conn. App. 743, 752, 341 A.3d 272 (2025). "[W]here . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in

isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's [fact-finding] process, a new hearing is required." (Internal quotation marks omitted.) *Autry* v. *Hosey*, 200 Conn. App. 795, 801, 239 A.3d 381 (2020). We are mindful that it is "the [trial] court's exclusive province to weigh the conflicting evidence [and] determine the credibility of witnesses . . . . The function of the appellate court is to review, and not retry, the proceedings of the trial court." (Internal quotation marks omitted.) *Housing Authority* v. *Stevens*, supra, 209 Conn. App. 580–81. "When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts as they appear in the record." (Internal quotation marks omitted.) *Edgewood Properties, LLC* v. *Dynamic Multimedia, LLC*, 226 Conn. App. 583, 589, 319 A.3d 123, cert. denied, 350 Conn. 905, 323 A.3d 344 (2024).

I

The plaintiff first claims that the court's finding of duress was clearly erroneous because there was no evidence in the record to support such a finding. We agree.

Duress is defined as a "forcible restraint or restriction" or a "compulsion by threat."[14] Merriam-Webster's Collegiate Dictionary (12th Ed. 2026) p. 511. In its memorandum of decision, the court determined that the written statements of previous tenants that were admitted into

---

[14] Similarly, Black's Law Dictionary defines duress as, "[b]roadly, a threat of harm made to compel a person to do something against his or her will or judgment; [especially], a wrongful threat made by one person to compel a manifestation of seeming assent by another person to a transaction without real volition." Black's Law Dictionary (9th Ed. 2009) p. 579. In other contexts, this court has stated: "The classical or common law definition of duress is any wrongful act of one person that compels a manifestation of apparent assent by another . . . without his volition. . . . The defendant must prove: [1] a wrongful act or threat [2] that left the victim no reasonable alternative, and [3] to which the victim in fact acceded, and that [4] the resulting transaction was unfair to the victim." (Internal quotation marks omitted.) *Johnson* v. *Raffy's Café I, LLC*, 173 Conn. App. 193, 207, 163 A.3d 672 (2017).

evidence were not "credible as they were most likely made in duress and not one resident, past or current, was present to testify in the multiday trial." The court made no other findings regarding duress.

After our careful review of the record, we cannot find any basis for the court's findings of duress in the record, other than mere speculation. The defendant testified only that statements by former residents were "false" and that the plaintiff wanted the former residents to testify against her. The defendant said that Naughton had somehow fabricated the statements against her by former residents, suggesting that there had been some type of agreement between the plaintiff and the former residents. The defendant offered no independent knowledge of any agreement between the plaintiff and former residents and offered no testimony to allow the court to infer that such an agreement had been made. Further, the defendant proffered no evidence of any act, threat, or misconduct by the plaintiff that would compel the former residents to offer statements against the defendant. We conclude that the court's finding that such statements were "most likely made in duress" is not based on evidence, but on mere speculation and is therefore clearly erroneous.[15] See *In re Selena O.*, 104 Conn. App. 635, 644–45, 934 A.2d 860 (2007) ("[i]f the court's conclusions or findings of fact rest on speculation rather than on sufficient evidence, they are clearly erroneous").

## II

The plaintiff also claims that the court erred in requiring it to submit direct evidence to establish a serious nuisance claim. We agree.

[15] In concluding that the court's finding of duress is erroneous, we are cognizant of our limited role on appeal. Whether the evidence on remand, including statements attributed to tenants, should be credited remains the sole province of the trier of fact. See *Housing Authority* v. *Stevens*, supra, 209 Conn. App. 580–81 ("It is the court's exclusive province to weigh the conflicting evidence [and] determine the credibility of witnesses . . . . Thus, if the court's dispositive finding . . . was not clearly erroneous, then the judgment must be affirmed. . . . The function of the appellate court is to review, and not retry, the proceedings of the trial court." (Internal quotation marks omitted.)).

Section 47a-15 defines a serious nuisance in relevant part as "conduct which presents an immediate and serious danger to the safety of other tenants or the landlord" or "using the premises or allowing the premises to be used for . . . the illegal sale of drugs . . . ." "[T]he existence of a nuisance generally is a question of fact, for which we invoke a clearly erroneous standard of review . . . ." (Internal quotation marks omitted.) *Housing Authority* v. *Stevens*, supra, 209 Conn. App. 580. To the extent the court draws a conclusion of law, however, our review is plenary. See *Edgewood Properties, LLC* v. *Dynamic Multimedia, LLC*, supra, 226 Conn. App. 589.

We note that "there is no legal distinction between direct and circumstantial evidence so far as probative [value] is concerned. . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence. . . . Insofar as circumstantial evidence can be and is routinely used to meet the higher standard of proof in a criminal prosecution, so can it be used in a case such as this where the applicable standard is that of [a preponderance of the evidence]." (Citations omitted; internal quotation marks omitted.) *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 278, 873 A.2d 208, cert. denied, 275 Conn. 905, 882 A.2d 668 (2005), and cert. denied, 275 Conn. 905, 882 A.2d 668 (2005).

In the present case, the court found that the plaintiff did not proffer any evidence demonstrating that illegal drugs, drug paraphernalia, or other items relating to the sale of drugs were found in the defendant's unit and that "there was no police involvement, investigation, or the observation of the sale of illegal drugs in or around the subject premises." The court thus determined that there was "no direct evidence" tying Mathis' death to any alleged drug activity in the defendant's unit. On this basis, the court concluded that there was "no evidence" that the defendant was involved in the illegal sale of drugs.

The evidence proffered by the plaintiff regarding the alleged drug activity in the defendant's unit included the

January 1, 2023 altercation, the December 29, 2023 overdose, the Naughton/Mathis statement, Rivera's written statement, Brewster's written statement, and the Dixon/ Brown written statement. The four statements were admitted into evidence without objection, and all stated that the defendant sold drugs out of her unit. Additionally, the plaintiff provided evidence of the "unreasonably high amount of [foot] traffic from individuals visiting at all hours . . . ." Thus, there certainly existed testimonial and circumstantial evidence in the record to support the plaintiff's claim of serious nuisance. We reiterate, however, that we do not, as a reviewing court, suggest that the trial court is required to credit such evidence, circumstantial or not, in determining whether the plaintiff has met its burden of proof. Nevertheless, because there is no legal distinction between circumstantial and direct evidence, we conclude the court's finding that there existed "no evidence" regarding the defendant's alleged drug activity in the unit was clearly erroneous. See *In re Jacob W.*, 330 Conn. 744, 774, 200 A.3d 1091 (2019) ("[i]n light of the abundance of evidence in the record contrary to the trial court's statement that there was *no evidence* presented . . . we are left with a firm conviction that a mistake has been made and, therefore, conclude that the trial court's finding was clearly erroneous" (emphasis in original)); *Osborn* v. *Waterbury*, 197 Conn. App. 476, 485, 232 A.3d 134 (2020) (finding " 'no evidence' despite an abundance of evidence in the record to the contrary" left this court with firm conviction that mistake had been made), cert. denied, 336 Conn. 903, 242 A.3d 1010 (2021).

For similar reasons, we conclude that the court's finding that there was "no evidence" that the defendant had engaged in or allowed others to engage in violence in her unit also is clearly erroneous. The video evidence admitted at trial portrays two violent altercations that appear to begin in the defendant's unit. Moreover, the defendant testified regarding the December 7, 2023 altercation and confirmed that she had asked Rivera to remove Brown from her unit before Rivera dragged

Brown out of the unit by her hair. The trial court credited that evidence that the altercation occurred in its findings of fact, wherein the court found "a tenant residing in the premises was dragged out of the defendant's unit by another tenant. The assault continued in the hallway, involving punching and kicking." Accordingly, the court's own recitation of the facts and the evidence adduced at trial that substantiates those findings belie the court's conclusion that the plaintiff proffered no evidence in support of these allegations.

The court's decision to require the plaintiff to submit direct evidence, as opposed to circumstantial evidence, to establish a serious nuisance is contrary to law. See *Boccanfuso* v. *Conner*, supra, 89 Conn. App. 278 ("[T]here is no legal distinction between direct and circumstantial evidence so far as probative [value] is concerned. . . . In fact, circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." (Citation omitted; internal quotation marks omitted.)). Further, on our careful review of the ample testimonial, documentary, and security video evidence admitted at trial, we are left with a "definite and firm conviction that a mistake has been committed"; (internal quotation marks omitted) *Giglio* v. *Ardohain*, supra, 233 Conn. App. 752; with respect to the court's finding that there was "no evidence" in the record that the defendant committed a serious nuisance through violent altercations in the defendant's unit and the alleged drug activity in the defendant's unit. See *Osborn* v. *Waterbury*, supra, 197 Conn. App. 485; see also *Commissioner of Environmental Protection* v. *State Five Industrial Park, Inc.*, 304 Conn. 128, 151, 37 A.3d 724 (2012) (reviewing court was left with "definite and firm conviction that a mistake has been made" due to, inter alia, trial court's employment of improper reasoning when analyzing facts); *Casiraghi* v. *Casiraghi*, 200 Conn. App. 771, 791, 241 A.3d 717 (2020) ("[b]ecause the court's finding of wilfulness stands in direct contradiction to the facts found by the court related to the plaintiff's ability to pay, we are left with the definite and firm conviction that the

finding is clearly erroneous and, thus, cannot stand”). In light of the foregoing, we conclude that the court’s finding that there existed “no evidence” in the record regarding the plaintiff’s allegations that the defendant committed a serious nuisance is clearly erroneous.

### III

We now must determine whether the court’s clearly erroneous factual findings were harmful and thus warrant reversal of the judgment rendered against the plaintiff. See *Autry* v. *Hosey*, supra, 200 Conn. App. 801. We conclude that, because these determinations were clearly erroneous, premised in part on speculation, contradictory, and incorrect as a matter of law, the plaintiff is entitled to a new hearing.

In its memorandum of decision, the court stated that the written statements submitted into evidence by the plaintiff were “most likely made in duress” even though there was no evidence proffered to support a finding of duress. In part I of this opinion, we concluded that this finding was clearly erroneous. On the basis of this clearly erroneous finding, the court “did not find those statements to be credible . . . .” In part II of this opinion, we concluded that the court improperly determined that there was “no evidence” that the defendant or her guests engaged in either of the uncontroverted acts of violence. On the basis of that improper finding, the court determined that there was insufficient evidence in the record to find that the defendant acted or caused her guests to act in a manner that “presented an immediate and serious danger to the safety of other tenants or the landlord . . . .” Lastly, the court found that there was “no evidence” that the defendant sold drugs from her unit, despite the evidence of foot traffic, written statements, and testimony. On the basis of this clearly erroneous finding, the court determined that there was insufficient evidence in the record to find that the defendant had engaged in serious nuisance.

Those erroneous findings, together with the court’s logical inconsistencies, were inextricably intertwined

with the court's conclusion that the plaintiff failed to meet its evidentiary burden on all counts of its complaint. After our careful review of the record, we are left with the "definite and firm conviction that a mistake has been committed"; (internal quotation marks omitted) *Giglio* v. *Ardohain*, supra, 233 Conn. App. 752; and these errors have undermined our "confidence in the court's [fact-finding] process . . . ." *Autry* v. *Hosey*, supra, 200 Conn. App. 801. We acknowledge that a reversal based on a trial court's findings of fact, or lack thereof, should be rare, and one that we do not engage in lightly. Yet, we are convinced that this is one of those rare cases where such a mistake has been made. See *Papantoniou* v. *Commissioner of Correction*, 235 Conn. App. 674, 692, 346 A.3d 985 (2025). In light of the court's clearly erroneous findings, and its reliance on these findings in its memorandum of decision, we cannot conclude that these errors were harmless. As such, a new trial is warranted in this case. See *Osborn* v. *Waterbury*, supra, 197 Conn. App. 488 ("our careful review of the record has undermined our confidence in the court's fact-finding process to the point where there is no other adequate or just remedy but to order a new trial").

The judgment is reversed and the case is remanded for a new trial.

In this opinion BISHOP, J., concurred.